JOHN W. BARRETT

*vs.*

LEWISTON, BRUNSWICK & BATH STREET RAILWAY COMPANY.

Sagadahoc.    Opinion December 4, 1908.

*Accord and Satisfaction.    Settlements.    Written Release.*

The plaintiff was a passenger on a street car of the defendant company and by reason of a partial derailment of the car, his right leg was fractured so that eventually it became necessary to amputate the leg above the ankle and later to amputate it above the knee. The liability of the defendant company for the damages sustained by plaintiff was not denied, and twenty-five days before the first amputation a settlement of the plaintiff's claim was effected and a release under seal was executed by the plaintiff and delivered to the defendant in consideration of the payment of $500 in cash and the assumption by the defendant company of all the hospital expense and surgeon's bills. Afterwards the plaintiff brought suit against the defendant company to recover damages for the injuries sustained. The execution of the aforesaid release on the part of the plaintiff and the full payment by the defendant company of the full consideration aforesaid, were not controverted by the plaintiff but the settlement was repudiated by him and its validity denied on the ground that as a result of the injury he was in such feeble condition of body and mind at the time of the alleged settlement that he "had neither the memory or the power of connected thought, nor the will to make a legal contract." The jury returned a special finding that at the time the plaintiff signed the release he did not have "sufficient mental capacity to understand that he had a claim against the railway company for compensation for the injury to his leg, and that by accepting the $500 and signing the release he was discharging the company from that claim." A general verdict was also returned for the plaintiff for $1612.50.

*Held :*  That there was not sufficient evidence to warrant the special finding of the jury that the plaintiff did not have sufficient mental capacity to comprehend the questions involved in his negotiations for a settlement of his claim and that, therefore, the general verdict must be set aside.

On motion by defendant.    Sustained.

Action on the case to recover damages for personal injuries sustained by the plaintiff and caused by the alleged negligence of the defendant.    Plea, the general issue.

Tried at the April term, 1908, Supreme Judicial Court, Sagadahoc County.    During the trial, the defendant introduced in defense a certain instrument signed and sealed by the plaintiff and by him delivered to the defendant and of the following tenor :

"To all whom these presents shall come or may concern, Greeting :

Know ye, That I, John W. Barrett, for and in consideration of the sum of five hundred dollars, lawful money of the United States of America, to me in hand paid by the Lewiston, Brunswick and Bath Street Railway, the receipt whereof is hereby acknowledged, have remised, released and forever discharged, and by these presents do for myself, my heirs, executors and administrators remise, release and forever discharge the said Lewiston, Brunswick and Bath Street Railway, its successors and assigns, of and from all, and all manner of action and actions, cause and causes of actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law or in equity, which against the said The Lewiston, Brunswick and Bath Street Railway ever had, now have, or which I or my heirs, executors or administrators, hereafter can, shall or may have, for, upon or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the day of the date of these presents.

"In Witness whereof, I have hereunto set my hand and seal the 27th day of October in the year of our Lord one thousand nine hundred and six.

"Sealed and delivered
    in the presence of
"F. C. Farr, Witness.

John W. Barrett,    (Seal)"

The plaintiff contended that at the time he executed the aforesaid instrument and as a result of his injury he was in such a feeble condition of body and mind that he "had neither the memory or the power of connected thought, nor the will to make a legal contract," and upon that issue the following question was submitted to the jury: "At the time of his signing the written release did the plaintiff have sufficient mental capacity to understand that he had a claim against the railway company for compensation for the injury to his leg, and that by accepting the $500 and signing the release, he was discharging the company from that claim?" The jury answered the question in the negative and also returned a general verdict for the plaintiff for $1612.50. The defendant then filed a general motion for a new trial.

The case is stated in the opinion.

*Oakes, Pulsifer & Ludden*, for plaintiff.

*Newell & Skelton*, for defendant.

SITTING: EMERY, C. J., WHITEHOUSE, SAVAGE, PEABODY, SPEAR, BIRD, JJ.

WHITEHOUSE, J. On the eleventh day of October, 1906, the plaintiff, a farmer living in the town of Topsham, was a passenger on the defendant's street railway car and by reason of a derailment of the rear wheels at a curve in the road north of the short bridge across the river, the body of the car came in collision with the iron truss of the bridge, and the right leg of the plaintiff, who was standing on the running board, was caught between the car and the bridge and both bones of the leg fractured near the ankle.

The plaintiff was immediately taken in a team to the office of Dr. Palmer in Brunswick, where the fractures were temporarily adjusted and the leg dressed by Dr. Palmer with the assistance of Dr Elliot. Subsequently on the same day, he was removed to the Sisters of Charity Hospital at Lewiston, where he remained until sometime in February, 1907. By reason of the injury to the muscles and blood vessels of the leg, it was the judgment of Dr. Russell in charge of the hospital from the time he saw the plaintiff on the twelfth day of

October, 1906, that amputation would be necessary, but the plaintiff would not consent to it until November 21, when the leg was amputated between the knee and the ankle, and the plaintiff says he remembers "how mad" he was with the doctor for amputating it then. But the improvement hoped for and expected was not realized and on the 29th day of January following, a second amputation was made above the knee. Thereupon satisfactory progress towards recovery was observable and the plaintiff was able to leave the hospital and go to his home in about three weeks from that time.

The liability of the defendant company for the damages resulting to the plaintiff from this injury was not contested and on the 27th day of October, 1906, twenty-five days before the first amputation, a settlement of the plaintiff's claim was effected by means of a personal interview between the plaintiff and Mr. Farr, the manager of the Railway Company, and a release under seal was executed by the plaintiff and delivered to the defendant in consideration of the payment to him of $500 in cash and the assumption by the company of all hospital expenses and surgeons bills.

The execution of this release on the part of the plaintiff and the payment by the defendant of the full consideration above specified, were not controverted by the plaintiff but the settlement was repudiated by him and its validity denied on the ground that as a result of the injury he was in such a feeble condition of body and mind at the time of the alleged settlement that he "had neither the memory or the power of connected thought, nor the will to make a legal contract."

At the trial of this action brought by the plaintiff to enforce his claim for damages, the jury returned a special finding that at the time the plaintiff signed the written release he did not have "sufficient mental capacity to understand that he had a claim against the railway company for compensation for the injury to his leg, and that by accepting the $500 and signing the release he was discharging the company from that claim." A general verdict was accordingly returned in favor of the plaintiff with damages assessed at

$1612.50. The case comes to the Law Court on a motion to set aside this verdict as against the evidence relating to the validity of the settlement.

With respect to the plaintiff's knowledge of his condition at the time of the execution of the release, Dr. Russell states that he had advised amputation from the beginning; that it was evident for three or four weeks that the plaintiff must lose his leg and that he so informed him before the settlement was made.

In regard to the circumstances leading to the negotiations for a settlement and the conditions under which the settlement was made, it appears from the testimony of Mr. Farr and Dr. Palmer that the plaintiff had expressed a desire to make a settlement with the company without the intervention of a lawyer and a willingness to negotiate with any representative of the company for that purpose and Dr. Russell testifies as follows in relation to that interview:

"Mr. Barrett was moved in the private room and Mr. Farr was in with him a certain length of time, I don't know how long; but after a time Mr. Farr sent for me and asked me if I wouldn't come in and witness Mr. Barrett's signature, as he had settled with him, and I did so. I asked Mr. Barrett if he was satisfied with the trade that he had made. I knew nothing of what he had got at that time, and he says, "I am." "Well, now," I says, "do you know if you lose your leg, or whatever comes up, that you wont get any more out of this if you sign this paper?" and he says, "I do, Mr. Farr has used me all right, and I am satisfied." I then asked him if he had read the paper he was going to sign. He said he hadn't, and I took the paper and read it to him, and asked him if he was satisfied to sign that paper, knowing that he would get nothing more. He said he was. He signed it and I witnessed it."

Dr. Russell further testifies that he saw the plaintiff every day from October 12 until October 31; that on the morning of October 27 when the settlement was made, the plaintiff's temperature and pulse were normal and that he saw nothing in his appearance to indicate that he did not perfectly understand the contract or release which he read to him. He states that subsequently there were times when he had sepsis or blood poisoning caused by the absorp-

tion of pus, and in order to relieve his suffering at such times it was necessary to give him morphia which "made him wandering a good deal," but that it was proved by the hospital chart kept in his case that this condition did not exist until November 1, and that on the morning of October 27 his mind was clear.

Dr. Palmer continued to visit the plaintiff after he took him to the hospital and saw him there four times before the settlement of October 27, and seven times after that time. He states that there was nothing in the plaintiff's physical condition or in the injuries from which he was suffering on October 27, which would indicate any impairment or weakening of his mental processes. He further testifies to a conversation with the plaintiff in relation to the settlement as follows :

"I came up from Brunswick to see him, and I hadn't talked with him but a few moments when he said, "Doctor, I have settled with the Road," and seemed pleased about it, and I asked him, or set out to ask him, what he got, and there were patients all around in the ward and I thought perhaps he wouldn't want to talk before them, and I set down some figures on a piece of paper and asked him if he got that, and he said "No." I judged from the way he talked that after I set down the figures he thought I was disappointed, and he said, "Doctor, you don't know how bad I wanted this money." He said, "I had some notes coming due at the bank, and," he says, "I wanted the money." I says, "Are you satisfied?" He says, "Perfectly satisfied." I remember very clearly the making of this remark : He says, "I have got the money and I am going to keep the leg."

Mr. Farr, the manager of the railroad, who made the settlement in behalf of the company, testified that in pursuance of the plaintiff's expressed wish to have a personal interview with the agent of the company for the purpose of obtaining a prompt settlement of his claim for damages, he called at the hospital on the morning of October 27 and found the plaintiff capable of discussing the matter clearly and intelligently. He testifies that after the terms of settlement had been agreed upon, he called Dr. Russell into the room and stated to him in presence of the plaintiff that they had agreed

upon a settlement and showed him the release which had been prepared but not signed.   According to his testimony the following conversation then occurred between Dr. Russell and the plaintiff.

"Now," he says, "Mr. Barrett, do you understand that when you sign this release, that you can get nothing more from the company?" Mr. Barrett says, "Yes, I do."   Dr. Russell says, "I want to read this release through to you, so as to be absolutely certain that you understand what you sign."   He read the release from start to finish.   "Now," he says, "Mr. Barrett, you understand it?"   Mr. Barrett says, "Yes."   He says, "When you put your name to that release you understand that it forever releases the company from any liability?"   "Yes."   "It is satisfactory to you?"   "Yes." There was a board that set in the room, some kind of a fixture; I took it and put it up on the bed and Mr. Barrett signed it and I witnessed it."

It is not contended in behalf of the plaintiff that any misrepresentations of fact were made by Mr. Farr during the negotiations for a settlement or that the release was obtained by any fraudulent methods.   It is not attacked on the ground of fraud.   Nor is there any suggestion that apart from the effect of the injury and the medical treatment the plaintiff was not a man of good intelligence and full legal competency to make contracts and transact business. The validity of the release is denied solely on the ground that by reason of the alleged septic poisoning and the influence of morphia administered to relieve his suffering, the plaintiff did not have sufficient mental capacity and strength to appreciate the existing conditions and to make the contract of settlement comprised in the release signed by him on the morning of October 27.

On the other hand the defendant says it is conclusively shown by the testimony of two disinterested surgeons based upon personal observation of the patient as well as the hospital chart, that whatever his condition may have been weeks or months later, there was nothing on the morning of October 27 to indicate that he was not in a normal condition of mind, possessed of sufficient active memory to collect all of the elements of the business to be transacted and sufficient mental power to form a rational judgment in relation to them.

It is further claimed that there is nothing in the testimony introduced by the plaintiff which has any legitimate tendency to show that on the morning of October 27, he did not talk coherently and act intelligently in making the settlement.

The plaintiff says he has no doubt that the name of John W. Barrett at the bottom of the release is his signature, although he has no recollection of writing it, and he remembers that Dr. Russell talked with him about the settlement and that he had in his possession $500 which he gave to the Sisters of Charity for safe keeping. He admits that he supposed he was all right up to the time of the final amputation, but says there are now two reasons why he thinks he was not in his right mind at the time of the settlement; one is the release itself, and the other is the fact that since the paper was written he has lost his leg.

Eight witnesses were called by the plaintiff. A patient who lay on a cot next to the plaintiff testifies that when he returned from the conference with Mr. Farr, he said he had settled with the company and "lay right down and went to sleep like." The male nurse who had care of him gives no testimony showing that he was not in a normal condition of mind on the morning of October 27, and admits in cross examination that the plaintiff then appeared as well and talked as rationally as he had before. He says the plaintiff went off to sleep as soon as he put him to bed, but Dr. Russell testifies that no narcotics were administered to him either that day or the day before. This nurse further states that he had repeatedly told the plaintiff both before and after the settlement that his leg could not be saved.

Six of the plaintiff's neighbors who called upon him at different times while he was under treatment at the hospital give testimony tending to show that on some occasions he was drowsy, or incoherent or irrational, but in no instance does this testimony relate to his condition on October 27, or at any time prior to that date; nor is it in conflict with the testimony of the surgeons.

The plaintiff was a man forty-five years of age, and that he was a man of unusually robust health and strength at the time of the accident is evident from the fact that after two amputations of his

leg he made such a prompt and excellent recovery that he was able to go to his home in three weeks after the last operation and has since suffered no appreciable pain. It may also be worthy of observation that the small amount of tissue and the crushed condition of the blood vessels at the point of the fractures near the ankle joint had a tendency to diminish the liability of a rapid absorption of the septic poison in the system, and to render more probable the accuracy of the surgeon's testimony and the reasonableness of the defendant's contention in regard to the alleged septic condition of the plaintiff on October 27.

Upon full consideration it is therefore the opinion of the court that there was not sufficient evidence to warrant the special finding of the jury that the plaintiff did not have sufficient mental capacity to comprehend the questions involved in his negotiations for a settlement of his claim and to form a rational judgment in relation to them. As observed by this court in *Valley* v. *Boston & Maine R. R. Co.*, 103 Maine, 106. "Settlements are favored by the law ; but if they are to be set aside upon the uncorroborated testimony of the claimant, though made in writing and signed by him, there will be little use in making settlements."

The certificate must accordingly be,

*Motion sustained.*
*Verdict set aside.*